UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN (Green Bay)

———————————————————————————————————

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                              Case No. 20-CR-00110-WCG

JESSE K. BELL,

        Defendant.

———————————————————————————————————

## DEFENDANT'S SENTENCING MEMORANDUM
———————————————————————————————————

### I. <u>Background</u>

Jesse Bell has entered a guilty plea to possession of child pornography involving a prepubescent minor or minor who had not attained 12 years of age. [R. 23]. His offense is probation eligible, and he faces no statutory minimum mandatory imprisonment term, and a maximum term of 20-years imprisonment. [PSI: ¶¶89, 94].[1] The advisory United States Sentencing Guideline range is 51 to 63 months. [PSI: ¶90]. The government will recommend a term no greater than 48-months imprisonment. [PSI: ¶6]. The defense will recommend a term of 30-months imprisonment, to be followed by 10 years of supervised release with a

———————————

[1] References to the Presentence Investigation report are denoted "[PSI: ¶___]."

1

condition of sex offender registration that continues for a period of 15 years after release from supervision.[2]

## II. Discussion

A. *History and characteristics of the defendant*

Bell is 33-years old. [PSI: ¶43]. He has lived with his disabled mother in the Fox Valley for most of his life. [PSI: ¶¶15, 44, 53, 81]. He maintained a strained relationship with his absent father, and no relationship in the last decade. [PSI: ¶¶43, 46]. The September, 2006 State of Wisconsin Presentence Investigation report concerning Bell's lone prior criminal conviction indicates that the defendant was raised in an extremely dysfunctional family with an extensive history of alcohol and drug abuse in the family. The report noted that the defendant's father has a long history of alcohol and marijuana abuse and has received in-patient treatment. [R. 25: 32, 33]. Collateral records from Winnebago Mental Health Institute (WMHI) indicates his mother has a history of alcohol abuse and entering dysfunctional relationships.

Bell has never been married and has sired no children. [PSI: ¶52]. He has had long-standing age appropriate female relationships, representing healthy sexual

---

[2]  Under federal law, as a Tier I sex offender the defendant must comply with registration requirements for a period of 15 years after release from custody. 34 U.S.C. §§ 20911(2) and 20915(a)(1). Under Wisconsin State law, the defendant must comply with registration for a period of 15 years after discharge from supervised release. Wis. Stats. §301.45(5)2. That amounts to a period of 25 years of sex offender registration for Bell.

interests. [PSI: ¶¶52, 62; R. 25: 34-35]. Bell has mostly lived a solitary life. [PSI: ¶44].

He started to abuse alcohol regularly at age 15, to the point of blacking out or vomiting. [PSI: ¶67]. Collateral records reveal he has also abused over the counter medications like Robitussin. After multiple failures with formal treatment, he ceased his alcohol intake a decade ago. [PSI: ¶¶67, 71]. He is capable of self-correction, gaining sobriety for a decade. [PSI: ¶105].

He has used marijuana as early as age nine (9) old and up to arrest to self-medicate and manage his anxiety. [PSI: ¶68]. He now recognizes its risks. [PSI: ¶68, 70].

At age 16, Bell was diagnosed with depression and prescribed Wellbutrin, which he uses to date. [PSI: ¶57]. A pre-sentencing assessment conducted by Sharon Kelley, Psy.D. reveals that Bell currently suffers from Persistent Depressive Disorder, and he likely has periods in which he experiences a much more profound and impairing depressive episode. [R. 25: 39].[3]

He has been diagnosed with minor and adult Attention-Deficit/Hyperactivity Disorder (ADHD), inattentive type, and prescribed Adderall, which he still uses. [PSI: ¶58; R. 25: 40].

---

[3] The defense arranged for a psychosexual assessment of Bell conducted by Sharon Kelley Psy.D. to help clarify Bell's psychological diagnosis and treatment needs. Dr. Kelley's full report and CV are attached to the PSI. [R. 25: 30-50]. Bell responded to the assessment in a forthright manner, as is his historical manner. [R. 25: 37].

3

Bell has been hospitalized, sought treatment and been diagnosed with panic attacks and anxiety in the last few years. [PSI: ¶55; R. 25: 31]. Dr. Kelley believes Bell is to date suffering from a great deal of baseline anxiety, for which he maintains a prescription for Lexapro, and which compounds all-around functioning in combination with depression. [PSI: ¶¶56, 58; R. 25: 39].

Suicidal thoughts resulted in hospitalization in 2004. [PSI: ¶¶55, 72]. Major depression and various substance abuse was diagnosed. *Id.* The PSI did not mention the defendant's Wis. Stat. Ch. 51 commitment to WMHI post-hospitalization. A WMHI May 7, 2004 progress note indicates Bell "…appears as if he is continuing to contemplate changes in his life. However, he actually never follows through with finding out how or what to change…does need continued extensive treatment…for his mental health issues." Those records indicate he had no structure and supervision.

Bell dropped out of special education high school curriculum, marred by excessive absenteeism, but obtained his HSED in prison. [PSI: ¶¶77, 78]. He has reportedly fared well in prison education and treatment programming, but has failed in education and employment in the community. [PSI: ¶¶73, 79]. He has never had a job that lasted more than a handful of months, and that was over a decade ago. [PSI: ¶¶81-85]. He has not been employed in the last four (4) years due to his emotional and mental health issues. [PSI: ¶¶81, 85]. Collateral reports

indicate that going to school and working a job has been too overwhelming. [R. 25: 33]. His emotional condition suggests he may be a candidate for disability benefits.

Concerning the defendant's lone prior conviction, he turned 18 years of age three (3) days before the date of the recklessly endangering safety offense. [PSI: ¶35]. He was sent to prison in 2006 at that age, despite mitigating circumstances. [PSI: ¶35]. The September 18, 2006 State of Wisconsin Circuit Court case sentencing transcript indicates that the defendant admitted to police that he stabbed the victim, while the victim never reported he was stabbed. [TR: 4]. When the victim attempted to retaliate post-offense, the defendant contacted law enforcement. [TR: 4-5]. The sentencing Court, the Hon. Joseph M. Troy, commented at sentencing, "…it's remarkable how forthright you have been about what you did. I mean, you have been absolutely truthful…you haven't minimized your involvement, you haven't made excuses for it…" [TR: 14-14].

Bell was returned to prison in 2011 for approximately 30 months when his extended supervision in that case was revoked based upon questionable sexual assault allegations made by his minor step-sisters, which was not prosecuted by the authorities. [PSI: ¶¶35, 104].[4] Bell consistently denied the allegations, but

---

[4] The older step-sister, age 18 years of age at the time of her report, told an Appleton Police Department investigator she had been sexually assaulted by Bell 2,000 to 3,000 times, thought she kept a diary documenting same, but could not locate it. *See* Offense Report ## LAC11-0086911 and 008701 authored by Sgt. Wills.

was homeless and elected to not contest revocation. [R. 25:34]. The Probation Officer authoring the PSI indicates the Court may consider those allegations as an aggravating factor. [PSI: ¶104]. Absent evidence of their veracity presented by the government at sentencing, the defense argues the Court should decline that invitation. Bell's second supervision period ended successfully. [R. 25: 34].

Bell has an inability to feel pleasure, has a marked lack of interest in anything or anyone, and has no hope. [PSI: ¶61]. WMHI records going back to his age 16 reveal that Bell has historically felt depressed, tearful, lacking energy, and without hope. His stress management is infirm. *Id.* He is in need of counseling and medication regimen to address persistent depression, anxiety, and attention deficit disorder. *Id.* Bell does not present with psychopathic or antisocial personality characteristics. [R. 25: 38].

Dr. Kelley opines that Bell's agitated / anxious depressive disorder cause clinically significant distress and impairment in social, academic, occupational, and legal functioning. [R. 25: 39]. When ADHD presents alongside Persistent Depressive Disorder, this diagnosis can further exacerbate social and occupational issues. [R. 25: 40]. This includes difficulty sustaining attention, difficulty with organization, avoidance of tasks requiring sustained attention, and being easily distracted. [R. 25: 40].

Bell appears to be utilizing avoidant coping. [R. 25: 39]. Rather than addressing his problems with social supports or work supervisors, he has attempted to manage his difficulties on his own. *Id.*

Bell was emotional while talking about his psychosocial history during his interview with Dr. Kelley. [R. 25: 31; 33]. Bell was emotional in the PSI interview when talking about the support of his mother and brother throughout the ordeal of this offense, as well as when the Probation Officer conducting the PSI interview kindly and patiently was giving him suggestions about BOP programming that would help his adjustment post-sentence. His lawyer has experienced similar emotional reactions from Bell when care and concern has been directed Bell's way. Bell reacts with tears whenever someone is kind to him. He feels he could benefit from seeing a counselor, commenting "it is always nice to have someone to talk to." [PSI: ¶60].

With the exception of a single positive test for marijuana, Bell has been compliant with strict conditions of his release, to include no internet access, for a period of six (6) plus months. [PSI: ¶¶3, 4, 75].

Bell has demonstrated acceptance of responsibility for the offense conduct. [PSI: ¶¶15-18, 30]. At least now he expresses some hope, indicating an interest in information technology education, with a goal for eventual employment with his anxiety treated. [PSI: ¶¶61, 81, 85].

7

B.      *Nature and circumstances of the offense*

In October of 2020, Bell entered a guilty plea to the possession of less than 10 images of child pornography.   [PSI: ¶¶5, 9, 24]. The bulk of the child pornography recovered on his cell phone in May 2020 was computer generated images, which possession is lawful, not constituting child pornography.   [PSI: ¶¶9, 23, 24].   Computer generated images are unlawful if they are indistinguishable from a real image of a minor engaging in sexually explicit conduct. *See* 18 U.S.C. §2256(8)(B).   Indistinguishable means virtually indistinguishable in that the depiction is such that an ordinary person viewing same would conclude the depiction is of an actual minor engaged in sexually explicit conduct. 18 U.S.C. §2256(11).

The Probation Officer who authored the PSI believes the number and nature of the computer-generated images possessed by Bell is an aggravating factor the Court may consider.  [PSI: ¶104].  If the material that appears to depict children is in reality manufactured without the use of any children, consideration of aggravation may not be well-placed.  Computers can create increasingly realistic depictions of things, people, and situations that never existed, not the product of real-world sexual exploitation of a child.  Yet, the Probation Officer's observation has some merit since protecting all children from the harmful effects of child pornography, including the myriad minors not actually depicted or used in its

production; eliminating pornographic images that may whet the appetites of pedophiles to abuse children sexually; and destroying the child pornography market are concerns implicated by lawful possession of computer generated images. *See ZA ex rel. R.C. v. Oswald*, 2008 WL 4372736, *7 (E.D. Missouri, September 22, 2008). Bell was engaged in a form of obscenity- which if promoting assaults on children is unconscionable- and so is a pertinent sentencing factor. The computer generated images may be relevant to Bell's need for sexual offender treatment. [R. 26: 2].

The nature of a child pornography offender's collecting behavior if it is primarily computer generated may be considered a mitigating factor. [R. 25: 35]. As too should Bell's lack of involvement with other offenders, in particular in an internet community devoted to child pornography and child sexual exploitation. Concerning the Probation Officer's point on amount of computer generated images, District Courts have been hesitant to sentence on the basis of number of images. *See, e.g., See also United States v. Diaz,* 720 F.Supp.2d 1039, 1042 (E.D.Wis.2010) ["offenders readily obtain the necessary number of images with minimal effort"]; *United States v. Burns,* No. 07 CR 556, 2009 WL 3617448, at *7 (N.D.Ill. Oct.27, 2009) ["the number and type of images received is frequently accidental."].

Bell has been a long-time viewer of mainstream pornography. [PSI: ¶¶62,

9

65].[5] He was downloading computer generated images (CGI) of adult and young female pornography, including "teen porn" based upon his attraction to older teens, which is in the normative range, and came across images of child pornography in searches he was conducting. [PSI: ¶¶15, 62, 63, 66]. His protective measure in searching for computer generated images was not risk free.

Something may be made of the homemade doll and videos of Bell engaged in simulated sex acts with it that was recovered by law enforcement. [PSI: ¶¶ 11, 63]. Bell maintains the doll was child-sized, but did not represent a child. *Id.* The doll was fashioned with hair on the vaginal area to resemble pubic hair, as well as breasts, resembling post-pubertal female. [R. 25: 40].

Dr. Kelley confirmed Bell has a history of consenting sexual relationships with peer-age and age appropriate female partners [R. 25: 34-35; 40]. He appears to present with a preferential arousal pattern to adult women. [PSI: ¶65; R. 25:

---

[5] Pornhub attracts 3.5 billion visits monthly, more than Netflix, Yahoo, or Amazon. Pornhub rakes in money from almost three billion ad impressions a day. One ranking lists Pornhub as the 10th- most-visited website in the world. The problem goes far beyond one company. Depictions of child abuse also appear on mainstream sites like Twitter, Reddit and Facebook. Google returns 920 million videos on a search for "young porn." The National Center for Missing and Exploited Children compiled the number of images, videos and other content related to child sexual exploitation reported to it each year. In 2015, it received reports of 6.5 million videos or other files; in 2017, 20.6 million; and in 2019, 69.2 million. Congress and successive presidents have done almost nothing as this problem has grown. The tech world that made it possible has been mostly passive, in a defensive crouch. Aside from limiting immunity so that companies are incentivized to behave better, here are three steps that would help: 1.) Allow only verified users to post videos. 2.) Prohibit downloads. 3.) Increase moderation. *See* file:///Users/tomwilmouth/Documents/Jesse%20Bell/Sentencing/Opinion%20%7C%20The%20Children%20of%20Pornhub%20-%20The%20New%20York%20Times.html [last visited February 12, 2021].

39].  He was not elevated on a psychometric scale measuring prepubescent sexual arousal. *Id.;* [R. 25: 38].  He did not endorse any thinking errors related to contact sexual offenses involving children or other paraphilia.  *Id.*  He did not demonstrate hyper-sexuality or sexual compulsivity.  *Id.*

Dr. Kelley opines that socially withdrawn, Bell turned to internet pornography, specifically searching for computer generated imagery, and a sex doll to get his intimacy and sexual needs met, rather than searching for real-life experiences. [PSI: ¶66; R. 25: 41].  His persistent depressive disorder with anxious distress, which in combination with ADHD exacerbates general social functioning, contributed to his offense conduct, which uniquely and primarily involves computer generated images of child pornography, versus real images, as part of his avoidant coping.  [R. 25: 41].

Child pornography has lasting impacts on victims. Victims live in constant fear that their images will surface and be viewed by their family or people they know. *See*, *e.g.*, Gertirtz-Meyden *et al.*, *The Complex Experience of Child Pornography Survivors*, 80 Child Abuse & Neglect 238 (2014).  Victims feel anxiety, sadness, depression, physical ailments, nightmares, torment, trauma, debilitated or dissociative relationships, suicidal thoughts, substance abuse, and more.  They feel fear, guilt and shame the images have been circulated, compounded by the belief that people might think that they were willing participants. *See id.*  So, though the

abuse memorialized by the recordation of their vulnerability as minors may be set in time, its crippling effects are in many ways perpetual or lifelong. Child pornography is a "permanent record" of that abuse, thereafter "exacerbated by [its] circulation." *New York v. Ferber*, 458 U.S. 747, 759, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *accord* U.S.S.C. 2012 Report at 112-13. "[E]very viewing of child pornography is a repetition of the victim's abuse." *Paroline v. United States*, 572 U.S. 434, 457, 134 S.Ct. 1710, 188 L.Ed.2d 714 (2014). Offenders view the plot for their aberrant entertainment, forgetting or callously ignoring that these are real children being subjected to real and horrific abuse.

Jesse Bell understands these concerns. He is contrite and sincere, evidencing recognition that the victims were and are real people to whom he has caused real harm. [PSI: ¶¶15, 16, 18, 30]. He said rather emphatically that he will never do something like this again. [PSI: ¶17]. He appears as forthright, truthful and accepting of responsibility as he did concerning his lone prior criminal offense in 2006.

Bell has not taken advantage of previous mental health counseling. He acknowledges he is now in need of the latter, together with sex offender treatment in the community to further evaluate his offense conduct. [PSI: ¶¶60, 64, 66]. What remains unanswered is whether his sexual interest in older teenagers (ages 17 to 21), which is within the normative range, extends to

younger teenagers, *i.e.* what is his specific arousal pattern.   [PSI: ¶66; R. 25: 41]. His emotional condition being causative, strict medication management must be a focus. *Id.*

C.   *Punishment*

Real children are harmed to create this material; and that harm is perpetuated each time the images are viewed.  No children were identified in this case. [PSI: ¶13].  Nevertheless, Bell has to be punished for his contribution to the market for this material, and others like him have to be deterred. However, in considering the need for punishment, it should be kept in perspective precisely what Bell did and did not do. He did not produce, distribute or share the images - contributing to any commercial market for child pornography-, or show them to any child.  He did not engage with other offenders, rather collected them for his personal use, a run-of-the-mill user who viewed the images privately.  He did not seek pecuniary gain or exchange money in his acquisition of images. The nature of his collecting behavior was unique, as the content of his collection was largely computer generated images.

The Court may consider the ongoing COVID-19 Pandemic and the greater risk of infection and death unique to the prison system, together with deeply circumscribed basic privileges within the prison as a result of the Pandemic. As of February 9, 2021, at least 377,000 people in prison, 10, 788 in Wisconsin prisons,

have tested positive for the illness. There has been at least 2,400 deaths, 25 in Wisconsin prisons. *See* https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons?utm_medium=email&utm_campaign=newsletter&utm_source=opening-statement&utm_term=newsletter-20210212-2367 [last visited February 12, 2021].

The BOP has begun vaccination of guards and high-risk inmates. The possibility that Bell may have the option to receive a vaccine at an unspecified later date in the future does not disarm the very real threat to him in the present posed by the well-established heightened danger of COVID-19 outbreaks in congregative living facilities. His confinement may be marked by continued lockdowns, isolation in quarantine, lack of access to programming and recreation, and fear of infection, rendering that time in custody particularly brutal and dehumanizing.[6]

In *United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007), the Court recognized that sentencing judges can take into account the harshness of prison conditions when assessing the severity of the sentence. District Courts have

---

[6]   When coronavirus concerns came to his Texas prison, Harlin Pierce was disappointed to learn that meant no more board games among prisoners. At first, Pierce and a friend tried to continue their regular chess matches by yelling out their moves from their respective cells. Then they decided they would just play each match in their own minds, whenever they would see each other. *See* https://www.themarshallproject.org/2021/02/11/when-the-prison-banned-board-games-we-played-chess-in-our-minds?utm_medium=email&utm_campaign=newsletter&utm_source=opening-statement&utm_term=newsletter-20210212-2367 [last visited February 12, 2021].

considered the ongoing Pandemic as a sentencing factor.  *United States v. Garcia,* No. 11-CR-989, 2020 WL 7212962, at*3 (S.D.N.Y. Dec. 8, 2020)[increased risks faced by vulnerable individuals and the heightened restrictions imposed upon all prisoners during pandemic may enhance deterrent effect of prison sentences served during the pandemic by making the conditions of confinement harsher, both physically and psychologically]; *United States v. Henareh*, No. 11-CR-93-1 (JSR), 2021 WL 119016, at *4 (S.D.N.Y. Jan. 13, 2021) [severity of sentence has been effectively increased because defendant was forced to confront a risk of serious illness and death, along with the psychological toll];  *United States v. Frost*, 16-CR-0582, 2021 WL 229665, at *6 (D. Md. Jan. 22, 2021) [granting compassionate release to high-risk inmate despite BOP's implementation of vaccination program, noting defendant's incarceration in the midst of a global pandemic has sufficiently increased the severity of the sentence beyond what was originally anticipated]; *United States v. Rodriguez*, No. 00-CR-761-2, 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) (citations omitted) [federal prisons, as prime candidates for the spread of the virus, impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal].

The COVID-19 Pandemic, aside from posing a threat to Bell's health, will make his incarceration harsher and more punitive than would otherwise have been the case.  This is aside from the notion how difficult prison will be for this

defendant due to his anxiety and depression.

D.    *Protection of the public*

Bell did not consider the number of children seriously and irreversibly traumatized by the making of these pictures and video he downloaded and viewed. Post-offense, he has demonstrated an ability to understand the seriousness of his offense. His ability and willingness to understand his conduct and how it affected the victims make it more unlikely that he would reoffend.

Based upon Bell's lack of relevant and substantial criminal history, he is unlikely to re-offend and does not present a danger to the public. He has no history of engaging in sexually abusive, exploitative, or predatory conduct with minors, consistently disputing the 2011 allegations of abuse of his step-sisters, for which there was not sufficient proof to prosecute criminally. [PSI: ¶¶ 35, 104]. He has a low risk of sexually offending as a pornography only offender.

A lengthy period of supervised release, with strict conditions including mandated school and employment efforts, mental health and sex offender assessment and treatment, sex offender registration, computer monitoring, and no unsupervised contact with minors is sufficient to protect the public and to deter Bell from future violations. [PSI: ¶ 105]. Bell is willing to participate in sex offender treatment in the community. [R. 25: 35].

E.    *Sentencing Guidelines*

The Guidelines call for a term of 51 to 63 months imprisonment [PSI: ¶90], but that range derived from the application of U.S.S.G. § 2G2.2, a seriously flawed provision worthy of little deference.  The Court is aware that the Sentencing Commission, the United States Department of Justice, and many other individuals and groups scrutinizing federal sentencing have suggested a need to reassess the Guidelines with respect to child exploitation crimes and consider reforms. *See* United States Sentencing Commission, *Report to Congress: Federal Child Pornography Offenses*, 311-331 (2012); U.S. Dept. of Justice, *Letter to The Honorable Paul B. Saris, Chair, United States Sentencing Commission* at 1 (Mar. 5, 2013). But that has not come.

Courts have explained the child pornography flaws in detail, a discussion that  need not be duplicated here. *See, e.g., United States v. Huffstatler*, 571 F.3d 620, 622-23 (7th Cir. 2009) ]collecting district court cases disagreeing with harshness of child pornography guidelines];  *United States v. Henderson,* No. 09–50544, 2011 WL 1613411, at *5–7 (9th Cir. Apr. 29, 2011); *United States v. Grober,* 624 F.3d 592, 603–07 (3d Cir.2010); *United States v. Dorvee,* 616 F.3d 174, 184–87 (2d Cir. 2010); *United States v. Diaz,* 720 F.Supp.2d 1039, 1041–47 (E.D.Wis.2010);   *see also United States v. Stone,* 575 F.3d 83, 97 (1st Cir.2009) ["[W]e wish to express our view that the sentencing guidelines at issue are in our judgment harsher than

necessary.  As described in the body of this opinion, first-offender sentences of this duration are usually reserved for crimes of violence and the like."], *cert. denied,* 130 S.Ct. 1115 (2010). In sum, §2G2.2 reflects the Sentencing Commission's attempt to respond to changes mandated by Congress, rather than an exercise of the Commission's proper institutional role of basing sentences on study and expertise.  *Kimbrough v. United States*, 552 U.S. 85, 109-10, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) [affording sentencing court discretion to vary from guidelines when they do not reflect "empirical data and national experience"].  Several of the glaring flaws in Guideline §2G2.2 are evident in this case.  [PSI: ¶¶21-23].

One area of focus has been the two-level enhancement assessed because an offense involves the use of a computer device. U.S.S.G. § 2G2.2(b)(6).  *United States v. Roberts,* 463 F.Supp.3d 860, 863 (N.D. Indiana March 11, 2020). [PSI: ¶23]. In this day and age, it nary requires a thought that child pornography would be maintained by way of a computer or computer service, and the 2018 sentencing Guidelines offer no commentary in their publication why possession in such commonplace manner is deserving of a two-level enhancement. *Id.* The two-level enhancement under U.S.S.G. § 2G2.2(b)(6) applies whether the computer was used for possession or distribution; and the absence of a stated differential in culpability and harm to victims and public from distribution suggests a more

mechanical, thus less thoughtful, imposition of two (2) more levels for possession, however wrongful that conduct and however worthy of a strong sentence. *Id.,* citing U.S.S.C. 2012 Report at 323-24 (reiterating this concern). For this defendant, the computer enhancement does not correspond to an elevated seriousness of his offense or to any of the purposes of sentencing. There is no indication that he intended to sell or distribute images to others for profit or otherwise, and empirical data does not show that using a computer as a means to possess and view pornography is a more serious or culpable offense than viewing the same images if they had been received by another medium, such as through the mail. *United States v. Hanson,* 561 F.Supp.2d 1004, 1010–11 (E.D. Wis.2008) [stating that this enhancement is logically flawed because on-line pornography generally comes from the same pool of images found in other formats]. Accordingly, a two-level enhancement to the Bells's base offense level for the use of a computer yields a sentence that is greater than necessary to achieve §3553(a)'s purposes. *United States v. Biddle*, 2014 WL 5089187, *7 (N.D. Indiana October 9, 2014).

The enhancement for possession of an image of a prepubescent minor or minor who had not reached the age of twelve does not further the purposes of sentencing. [PSI: ¶21]. In 2010 non-production cases, 96.3% of offenders possessed child pornography depicting prepubescent minors or minors under the

age of 12. *Report to Congress: Federal Child Pornography Offenses* at 140–41. As other courts have noted, images of very young children are sadly "typical of this crime," and do not indicate increased culpability for those receiving such images. *Hanson,* 561 F.Supp.2d at 1009; *United States v. Burns,* No. 07 CR 556, 2009 WL 3617448, at *7 (N.D.Ill. Oct.27, 2009); *United States v. Burns,* 2009 WL 3617448, * 13 (N.D. Ill October 27, 2009). There is no evidence that Bell specifically sought out prepubescent minors. The Court should find that applying this enhancement would not appropriately measure Bells's culpability under the facts of this case.

In 2010, U.S.S.G. § 2G2.2(b)(4), the enhancement for possession of sado-masochistic images applied in 74.2% of all cases. *Report to Congress: Federal Child Pornography Offenses* at 316. [PSI: ¶22]. Although originally intended to provide additional proportional punishment for aggravating conduct, this enhancement now routinely applies to the vast majority of offenders. *Biddle,* 2014 WL 5089187, at *8. There is no evidence that Bell sought out sadomasochistic images. USSG §2G2.2, Application Note 3 indicates this enhancement applies regardless of whether the defendant specifically intended to posses materials that are sadistic or masochistic. [PSI: ¶22]. Accordingly, a four-level enhancement to Bell's base offense level for possessing sadomasochistic images yields a sentence that is greater than necessary to achieve § 3553(a)'s purposes.

The three (3) Guideline enhancements (the computer enhancement, the enhancement for images of prepubescent minors, and the enhancement for sadistic or masochistic images) lead to an inaccurate indication of the severity of the Bell's offense and do not serve to promote the goals of sentencing in this case. [PSI: ¶¶21-23]. The Guideline enhancements result in an artificially high sentence for his no-contact child pornography offense. Accounting for the Defendant's base offense level of 18, *see* U.S.S.G. § 2G2.2(a)(1) [PSI: ¶20], three (3) level credit for acceptance of responsibility [PSI: ¶¶30,31], and criminal history category II [PSI: ¶38], these three (3) enhancements result in an advisory Guideline range of 51 to 63 months imprisonment as opposed to a range of 21 to 27 months of imprisonment. Bell's sentencing recommendation is three (3) months higher than the high end of that Guideline range.

F.     *Judicial recommendations*

Bell requests the Court recommend his placement at the Federal Correctional Institution at Oxford, Wisconsin, and that he surrender as directed by the Federal Bureau of Prisons after May 15, 2021 for COVID-19 Pandemic amelioration.

## III.  Conclusion

Jesse Bell has a tough go of it. He is suffering from a significant degree of emotional distress. [R. 25: 36]. He has substantial obstacles to living a pro-social

life. He would benefit from treatment aimed to address his current level of dysphoria and hopelessness, anxiety and stress management, and difficulties associated with social avoidance. *Id.* He needs to finally follow through with changes in his life with the aid of structure and supervision. Gone need be the days of regression, reinforced sensation seeking behavior, moral flexibility, anonymity, escaping, fantasy and familiarity via internet intoxication. Based upon his base character, there is evidence he can enjoy a good life, and the community may benefit by what he offers, which is unique sensitivity.

The facts and circumstances discussed herein counsel a sentence of 30-months imprisonment to be followed by a decade of supervised release, the conditions of which the defense waives reading and has no objection, to include a quarter century of sex offender registration. [PSI: ¶105]. That is a reasonable disposition that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2).

Dated at Green Bay, Wisconsin on February 13, 2021.

Respectfully submitted,

/s/ Thomas G. Wilmouth
Thomas G. Wilmouth
P.O. Box 787
Green Bay, WI 54305
[715] 525-1685    Telephone
[715] 598-6208    Facsimile
tom.wilmouth@gmail.com
